[Cite as *B.U. v. Bolshakov*, 2026-Ohio-3123.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

B.U.,

Petitioner-Appellee,

v.

NICHOLAS BOLSHAKOV,

Respondent-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 26 BE 0008**

---

Domestic Relations Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 23 DR 244

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Jane M. Hanlin*, Bruzzese, Hanlin & Bruzzese, LLC, for Petitioner-Appellee and

*Atty. Sheryl A. Shaw*, Law Offices of S. Shaw, LLC, for Respondent-Appellant.

Dated: August 12, 2026

**Robb, J.**

**{¶1}** Respondent-Appellant Nicholas Bolshakov. appeals the Belmont County Common Pleas Court's judgment adopting a magistrate's decision in a case involving an existing domestic violence civil protection order covering Petitioner-Appellee B.U. and her two children as protected persons. Due to Appellant's further violation of the protection order and purge conditions, the court imposed a jail sentence that was previously suspended twice in prior contempt proceedings. The court also granted Appellee's motion to modify the protection order by extending the term from two years to five years. For the following reasons, the judgment is affirmed.

## STATEMENT OF THE CASE

**{¶2}** On July 10, 2023, Appellee filed a petition for herself and her two children (born in 2006 and 2013) against Appellant, seeking a domestic violence civil protection order (DVCPO or more briefly CPO). The parties were unmarried, and Appellant was the father of the youngest child. In the petition, Appellee checked the box for an order allocating temporary parenting rights for the child and the box asking the court to suspend or place conditions on any established parenting time. The court issued an ex parte CPO. (7/10/23 CPO).

**{¶3}** Appellee then acquired counsel. Due to continued communications from Appellant after the issuance of the ex parte CPO, Appellee filed a motion for contempt on July 23, 2023. The motion alleged Appellant texted messages to her two days prior. An attached exhibit showed four texts with the final one saying, "Arrest me. Done fucking with you. Tell my kids I love them!"

**{¶4}** Appellee filed another contempt motion on August 1, 2023, saying Appellant called her twice on July 20 and twice on July 26 and sent harassing texts that week as well. Exhibits attached to the motion included texts saying: "Your fucked ex. Hope that god has mercy on you after all you've died be cunt!!!"; "Can't wait until we die together. You will regret what you've done with both of our children! You're fucked cunt!!"; "God will cut you down you miserable soul"; "I'll destroy your ass"; and "You will immediately implode!! Can't wait . . . You're life is doomed cunt!! Good luck bro."

Case No. 26 BE 0008

{¶5} The hearing on the contempt motions was set for October. In the meantime, the parties appeared with attorneys before a magistrate for the full CPO hearing. (8/22/23 J.E.). Appellant consented to the issuance of the CPO.

{¶6} The two-year domestic violence CPO signed by the court and the parties as a consent agreement included Appellee and her two children as protected persons. Appellant was prohibited from abusing, harming, threatening, following, stalking, or harassing those named in the order. He was to delete individual photographs or videos of Appellee and refrain from posting or disseminating other photographs or videos if Appellee was in them with other people. He was also prohibited from initiating or having any contact with the protected persons with contact defined in the order as including social media, blogging, posting, or other communications by any means directly or indirectly through someone else.

{¶7} As an exception related to the parties' child, a clause on temporary parenting time allowed Appellant two calls per week to be initiated by the child during which Appellant would refrain from disparaging Appellee or discussing the case. This was said to be the product of a referral of the parenting time issues to the Juvenile Division. It was noted a hearing on parenting issues in 20-JI-21 was set for the same date in October as the hearing on the pending contempt issues in this case. (8/22/23 CPO); (8/22/23 J.E.).

{¶8} A week later, Appellant filed a motion complaining he was at work (underground) when Appellee allowed their child to initiate the agreed communication. He asked for a set time for the communication, noting his work shift started when the child's school day ended.

{¶9} After the October hearing, the court reissued the CPO with the parties' consent after amending the portion related to communications with the child in order to set a time on Sundays and adding two texts per week from the child to Appellant. (10/30/23 CPO) ("Modification from the orders issued August 21, 2023 were made by agreement at the hearing conducted October 24, 2023 and are reflected in the order updated herein.").

{¶10} Regarding Appellee's July and August 2023 contempt motions, the magistrate found Appellant repeatedly violated the ex parte CPO by texting Appellee. It

was noted he blamed these violations on his use of alcohol. He was found in contempt and sentenced to a suspended term of 30 days in jail with a 36-month purge period conditioned on him *strictly* abiding by court orders including the terms of the CPO, attending alcohol and mental health evaluations, and complying with treatment recommendations. In the decision signed by the magistrate and the trial court, Appellant was advised about the right to file a timely objection to the magistrate's decision. (10/30/23 J.E.). He did not file objections.

{¶11} On December 20, 2023, Appellee filed another motion for contempt with a request to impose the suspended sentence. With exhibits in support, the motion alleged continued harassment on social media wherein Appellant disparaged her and encouraged others to do the same. One Facebook post, containing a photograph of Appellant with the younger child, stated: "If anyone talks to his bi polar mother, please send a message, "YOU'RE A PIECE OF SHIT!" After Appellant obtained a continuance, this contempt motion was heard on March 11, 2024. (3/13/24 Mag.).

{¶12} On May 31, 2024, the magistrate found Appellant in contempt of CPO, noting this was the second time he was found in contempt. The decision said Appellant admitted posting the exhibits to his Facebook page but argued he could not violate the protection order if Appellee was not his friend on Facebook and others forwarded the messages to her. Regardless, the decision pointed out Appellant was prohibited from indirectly contacting Appellee or encouraging others to do an act prohibited by the order, emphasizing how one of the posts specifically requested someone to relay his message to Appellee for him. The magistrate made note of Appellant's alcohol counseling and inpatient treatment and imposed only 10 days of the previously suspended 30-day jail sentence (with work release) instead of imposing the entire sentence as Appellee requested. The balance of 20 days remained suspended under the same purge period and conditions.

{¶13} Appellant filed objections, which the trial court overruled. The court opined the magistrate was lenient in imposing only 10 days of the suspended sentence and allowing work release. (6/29/24 J.E.). Appellant served the 10 days in jail.

{¶14} In the meantime (between the March contempt hearing and the magistrate's decision), Appellee filed the two motions at issue in this appeal. One motion asked the

court to impose the contempt sentence on Appellant, alleging further social media harassment between April 18 and May 8 constituting continual violations of the CPO and the purge conditions. Four exhibits were attached in which Appellant complained about Appellee. One post named and spoke to her. A summons to answer for contempt was served on Appellant.

**{¶15}** At the same time, Appellee filed a motion to modify the protection order by extending it to five years from the original issue date due to Appellant's failure to defer to the order and his repeated violations. (5/16/24 Motions[1]). A separate summons was served on Appellant.

**{¶16}** On July 1, 2024, the hearing proceeded on these motions. Appellee presented nine posts, which Appellant admitted posting in reference to Appellee. She testified the messages were forwarded to her by other people, including her own minor son and a mutual friend (who received a text from Appellant with a screenshot of his own Facebook posts). Appellee also described how a teacher, who was friends with Appellant, called her son out of class to ask about the situation after viewing Appellant's posts.

**{¶17}** After the hearing, the matter was "held for decision" and this deferment lengthened due to Appellant's attempt to appeal[2] and then to allow Appellant's new attorney to provide additional assistance. (9/3/24 Mag.); (5/8/25 Mag.) (explaining the delay). On October 4, 2024, Appellant's new attorney filed a motion to terminate the protection order or modify it to remove the children. A hearing was set for January.

**{¶18}** On December 20, 2024, Appellee filed another motion for contempt, citing Appellant's Facebook posts criticizing opposing counsel and the court while asking his supporters to come to court. Appellant received a continuance of the hearing in this case and in the juvenile "companion case" until the same date in February. (1/8/25 Mag.).

---

[1] Although the clerk's entry in the docket says Appellee's motion to modify/extend was filed on May 17, 2024, this motion is date-stamped May 16, 2024, the same date as her motion to impose sentence.

[2] Appellant purported to appeal the magistrate's May 31, 2024 decision on the same day he objected to it. He captioned the notice of appeal in the United States District Court of the Northern District of Ohio. After his filing received a case number in our court (24 BE 0022), the appeal was dismissed for failure to proceed. (9/24/24 J.E.).

**{¶19}** On February 3, 2025, the magistrate heard testimony by the parties and other witnesses and admitted multiple exhibits. This hearing was recessed until March 5, 2025 when a further hearing proceeded. (2/4/25 Mag.); (3/6/25 Mag.).

**{¶20}** On May 8, 2025, the magistrate issued a decision on all outstanding motions. The magistrate denied Appellee's latest contempt motion finding her exhibits containing Appellant's December 2024 posts were not sufficient violations.

**{¶21}** In the same entry, the magistrate granted Appellee's May 2024 motion to impose the remaining 20 days of the suspended sentence for contempt (the decision that was previously held). Citing the July 2024 hearing on the motion, the decision focused on Exhibit D, finding it a direct attempt to contact Appellee and a clear violation of the CPO.

**{¶22}** The magistrate also granted Appellee's contemporaneous motion to modify the protection order by extending it until August 21, 2028. It was noted this extension from two years to five years (from the date of issuance) resulted in a maximum duration CPO. The magistrate denied Appellant's motion to terminate the protection order or to modify it to eliminate the children. The decision pointed out the parenting time issues he raised regarding their shared child could be addressed through juvenile court proceedings. (5/8/25 Mag.).

**{¶23}** Thereafter, the trial court granted Appellant extensions to file objections after obtaining any necessary transcripts. The objections were finally filed January 12, 2026. Appellant contested the imposition of the remaining jail sentence for contempt, the extension of the CPO, and the inclusion of the children in the extension.

**{¶24}** On January 28, 2026, the trial court overruled Appellant's objections and adopted the decision of the magistrate while making multiple findings of fact and conclusions of law. In imposing the remaining 20 days of the previously suspended jail sentence, the court found clear and convincing evidence Appellant's conduct violated the agreed CPO and thus the purge conditions, pointing to the nine Facebook posts introduced at the hearing especially Exhibit D. Rejecting his argument about a lack of continued violations to support an extension, the court found modification of the CPO by extending it another three years was supported by the evidence. Appellant filed a timely notice of appeal.

Case No. 26 BE 0008

## INTRODUCTORY LAW

**{¶25}** Appellant sets forth three assignments of error. The first deals with the decision to impose the suspended sentence for violating the purge conditions and the CPO. The next two deal with the extension of the CPO for a longer term while maintaining the children as protected persons. Before setting forth the assignments, we introduce some governing law.

**{¶26}** "R.C. 3113.31 establishes a comprehensive statutory scheme for issuing, modifying, and terminating domestic-violence civil protection orders. The statute vests the court with broad authority to tailor domestic-violence civil protection orders to fit the needs of each particular case." *Cyran v. Cyran*, 2018-Ohio-24, ¶ 13. Civ.R. 65.1 applies to "special statutory proceedings under R.C. 3113.31 . . . providing for domestic violence . . . civil protection orders." Civ.R. 65.1(A).

**{¶27}** In addition to applying to the initial CPO petition, "When a motion for modification, contempt, renewal, or termination of a civil protection order is referred to a magistrate for determination, the provisions of this division (F)(3) of this rule relating to full hearing proceedings shall apply unless such provisions would by their nature be clearly inapplicable." Civ.R. 65.1(F)(3)(e).

**{¶28}** Where a magistrate hears the matter and issues a decision, "A party filing objections under this division has the burden of showing that an error of law or other defect is evident on the face of the order, or that the credible evidence of record is insufficient to support the granting or denial of the protection order, or that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order." Civ.R. 65.1(F)(3)(d)(iii). This outlines the various standards of review for the trial court depending on the argument presented.

**{¶29}** Within general contempt cases, the Supreme Court regularly observes, "This court reviews a lower court's decision in a civil-contempt proceeding for an abuse of discretion." *State ex rel. Cincinnati Enquirer v. Hunter*, 2013-Ohio-5614, ¶ 21, citing *State ex rel. Ventrone v. Birkel*, 65 Ohio St.2d 10, 11 (1981). An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶30}** Addressing an abuse of discretion review, Appellant points out appellate courts often make the following observation: "On review of the trial court's decision to adopt, reject, or modify a magistrate's decision, an appellate court applies an abuse of discretion standard." *Calhoun v. Calhoun*, 2021-Ohio-4551, ¶ 15 (7th Dist.), citing *RBS Citizens, NA v. Sharp*, 2015-Ohio-5438, ¶ 9 (7th Dist.). Nevertheless, the review is de novo for legal questions (regardless of whether a magistrate ruled in the first instance). *RBS* at ¶ 9.

**{¶31}** While applying an abuse of discretion standard, Appellant raises arguments sounding in both sufficiency and weight of the evidence, either directly or through the cases he cites, and makes combined references to sufficient credible evidence or some competent credible evidence. Until the Ohio Supreme Court's *Eastley* case, many jurists were under the impression the term "some competent, credible evidence" represented a merger of evidentiary concepts in the civil law. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 8-10, 14-16. However, sufficiency and weight are distinct concepts in all cases, not just in criminal cases. *Id*. at ¶ 23.

**{¶32}** In observing how prior decisions blurred various lines, the Supreme Court subsequently pointed to the tendency of some courts to apply an abuse of discretion standard while using the term "competent, credible evidence" without recognizing both sufficiency and weight may be raised in a review for whether a decision was supported by clear and convincing evidence. *In re Z.C.*, 2023-Ohio-4703, ¶ 15-18 (a permanent custody case).

**{¶33}** Sufficiency is a question of law asking whether any rational trier of fact could find the requisite standard of proof satisfied on each contested element after construing all evidence and inferences in the light most favorable to the party with the burden of proof or to the court's judgment. *Id.* at ¶ 11. Sufficiency deals with the adequacy of the evidence produced, not the persuasiveness of it, which is the subject for a weight of the evidence analysis. *State v. Messenger*, 2022-Ohio-4562, ¶ 26. An evaluation of witness credibility is not involved in a sufficiency review, as the question is whether the evidence is sufficient if it is believed. *State v. Murphy*, 91 Ohio St.3d 516, 543 (2001).

**{¶34}** Distinctly, weight of the evidence concerns "the effect of the evidence in inducing belief" with the corresponding review evaluating "the inclination of the greater

amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Eastley* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). When a party argues a judgment is contrary to the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence including reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Thompkins* at 387. The fact-finder occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Essentially though, a judgment must necessarily be supported by sufficient evidence if it is supported by the weight of the evidence. *State v. Friend*, 2025-Ohio-3270, ¶ 31 (7th Dist.).

<u>ASSIGNMENT OF ERROR ONE</u>

**{¶35}** Appellant sets forth three assignments of error, the first of which provides:

"THE TRIAL COURT ERRED BY ADOPTING THE MAGISTRATE'S DECISION IN FINDING THE APPELLANT IN CONTEMPT OF COURT FOR POSTING ON HIS PERSONAL FACEBOOK ACCOUNT AS CONTACT TO THE PROTECTED PERSON."

**{¶36}** Appellant contends the trial court abused its discretion by acting unreasonably in finding clear and convincing evidence that he was in contempt by violating the CPO. Appellee agrees this would be the issue for our review (without suggesting a contempt showing was not required where the issue was the violation of purge conditions requiring strict compliance with the CPO and the remedy). The parties also agree civil contempt must be established by clear and convincing evidence. *Ferguson v. Boron*, 2018-Ohio-69, ¶ 14 (7th Dist.).

**{¶37}** In addressing this argument in Appellant's objections, the trial court's judgment pointed out Appellant had already been found in contempt and the proceeding before it was for imposition of the balance of a previously-suspended contempt sentence. The Supreme Court has explained, "A purge hearing is not a new contempt proceeding but a conclusion of the originating contempt hearing, because its purpose is to determine whether the contemnor has satisfied the purge conditions." *Liming v. Damos*, 2012-Ohio-

<u>Case No. 26 BE 0008</u>

4783, ¶ 16. Regardless, the trial court alternatively addressed and rejected Appellant's argument on the imposition of the contempt sentence by finding a violation of the CPO and the purge conditions by clear and convincing evidence.

**{¶38}** "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. . . . It does not mean clear and *unequivocal*." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Z.C.*, 2023-Ohio-4703, at ¶ 12, quoting *Cross* at 477. Upon such reasoning, the Supreme Court instructed courts to review for sufficiency and/or weight of the evidence depending on the nature of the arguments raised even if the parties agree the standard of review was abuse of discretion. *Id*.

**{¶39}** We turn to the language of the agreed CPO. Listing Appellee and her two children as protected persons, the CPO specified:

> RESPONDENT SHALL NOT INITIATE OR HAVE ANY CONTACT with the protected persons named in this Order . . . Contact includes, but is not limited to . . . telephone; text instant messaging; fax; email; voicemail; delivery service; social media; blogging; writings; electronic communications; posting a message; or communications by any other means directly or indirectly or through another person.

(10/30/23 CPO); *see also* (8/22/23 CPO). An additional clause prohibited him from causing or encouraging any person to do any act prohibited by the order. *Id*.

**{¶40}** Appellant frames the dispositive issue as whether his posts on his Facebook page constitute "contact" under the terms of the CPO. According to his argument, it is unreasonable in this "digital age" to find the mere creation of content that others circulate constituted contact under the terms of the CPO. He says he did not specifically direct anyone to forward his message this time and cannot be expected to control who decides to forward his posts to Appellee, claiming there was no evidence of action on his part regarding initiation of the communication.

Case No. 26 BE 0008

**{¶41}** Appellant cites a case where an appellate court concluded there was insufficient evidence to find the criminal offense of violating a protection order. *See State v. Kersey*, 2004-Ohio-274, ¶ 12, 14 (4th Dist.). The court opined a rational person could not find (beyond a reasonable doubt) the defendant encouraged anyone to call the victim and he was not required to prevent others from contacting her on their own initiative (merely because he was prohibited from contacting her or using others to do so). *Id.* (where the victim complained there were three missed calls from the defendant's number, and testimony indicated the defendant's mother asked the defendant's wife to call the victim to ask if a child could attend an ice show with her during the victim's parenting time). The holding was based on the lack of evidence that the defendant engaged in any conduct at all; it did not involve active posting about a protected person. *See id.*

**{¶42}** In contrasting his posts from other cited cases, Appellant claims his account was private, he blocked Appellee, only one post at issue specifically named her, and he did not actively ensure she would receive the posts (such as by "tagging" her). *See e.g., State v. Sutton*, 2025-Ohio-2469, ¶ 20-24 (6th Dist.) (a criminal case of violating a protection order where the court rejected the defendant's manifest weight of the evidence argument by noting although he claimed to believe she would not be contacted because they blocked each other, she believed he tagged her as Facebook notified her about her name being mentioned in a post and she was also forwarded the posts by others). An appellate decision upholding the weight of the evidence in a case does not translate to a holding that the lack of a cited fact would have resulted in reversal.

**{¶43}** Moreover, Appellant's testimony indicated his account was public at the time. (7/1/2024 Tr. 11, 15). He says he was merely venting to his Facebook friends when writing the posts (in the exhibits relied on in imposing the remainder of his suspended jail sentence). He urges the CPO does not prohibit speech about Appellee and thus he can make declarations to others about her looks, her mental state, her fidelity, and her role in him not seeing the children.

**{¶44}** Appellant appended comments about the child's mother to photographs of the parties' child (an additional protected person in the CPO). At the end of one post, he spoke directly to this child and to Appellee's other child, who is also protected by the CPO, and said it was a shame he has not seen them "because of a few drunk texts last year

and a Facebook post!! All because my ex was banging my boss . . . Her and the court system are wrong. And people expect me to be normal, yall have no idea. Let's hope things can get back to normal soon." (Ex. B).

**{¶45}** In another post, Appellant criticized the oldest child and acknowledged the youngest was being told about the comment: "This bitch has brainwashed our oldest already. Questioning me over posts like these, things I've said in the coal mine, are you serious?? He was coached to ask these questions. And was ripping my ass. And surprisingly, I took it. Told me that he told [the youngest child] everything I posted and that [the youngest child] didn't want to talk to me. Hard to blame a 17 year old when his mother is a narcissistic controlling asshole that gets away with everything! I said that mom was cheating on me with him. By him I mean a fat bald fuck that [disparaging the man]." (Ex. F).

**{¶46}** In an additional post, Appellant made a major accusation regarding Appellee's employment, which the trial court found false. (Ex. E). A further post makes the reader wonder if Appellant was regularly watching Appellee or her residence, wherein he named a man while complaining, "The fag that's allowed around my kids when I'm not. Any comments? I've been looking for this douche fuck for over a year." (Ex. G).

**{¶47}** The trial court concluded Appellant intended to cause other people to direct the outrageous posts to Appellee and the posts thus constituted at least indirect initiation of contact under a CPO prohibiting "communications by any . . . means directly or indirectly or through another person." We point out circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001) (and a person's intent is based on inference from the totality of the circumstances). Appellant's behavior throughout the proceedings would be relevant to his intent.

**{¶48}** Regardless, as emphasized by the magistrate and the trial court, one of Appellant's posts spoke straight at Appellee. He does not just mention her but speaks directly to her: "Reminds me of my ex. Miss her and love her because she's the mother of my children. But straight up nasty!! But finally forgiven. [Names Appellee by first name]. No more court. You're taking money from our sons!! I'll give you whatever you

want. Just let me see my sons. [Uses Appellee's first and middle initial]!! Hope we can co parent soon." (7/1/24 Tr., Ex. D).

**{¶49}** A rational trier of fact could clearly and convincingly conclude this violated the CPO, which prohibited him from initiating or having contact with Appellee including through social media, blogging, writing, electronic communications, or posting a message (or communications by any other means directly or indirectly or through another person). And, as the court pointed out, this violated his purge conditions, which ordered him to strictly comply with the CPO to avoid serving the balance of his sentence (originally imposed for a prior contempt and partially served for a second contempt). Sufficient evidence supported the decision, and there was no legal error by the trial court in upholding the magistrate's decision on this issue.

**{¶50}** Moreover, the decision finding Appellant in contempt and in violation of the purge conditions before imposing the balance of his contempt sentence was not contrary to the manifest weight of the evidence. Weight and credibility are primarily for the fact-finder as opposed to the reviewing court. *State v. Hunter*, 2011-Ohio-6524, ¶ 118. Upon considering all the evidence and reasonable inferences, the trier of fact did not "clearly los[e] its way" in assigning credibility and weighing evidence. *Thompkins* at 387.

**{¶51}** Nor did the trial court abuse its discretion by finding Appellant in contempt and in violation of the purge conditions and thus upholding the magistrate's decision imposing the balance of the suspended sentence. This assignment of error is overruled.

<u>ASSIGNMENT OF ERROR TWO</u>

**{¶52}** Appellant's second assignment of error contends:

"THE TRIAL COURT ERRED BY ADOPTING THE MAGISTRATE'S DECISION TO RENEW THE CPO FOR AN ADDITIONAL THREE YEARS BASED ON THE UNDIRECTED SOCIAL MEDIA POSTS AND IN THE ABSENCE OF THREATENING OR HARMFUL CONDUCT BY THE RESPONDENT TOWARDS THE CHILDREN."

**{¶53}** Appellant relies on the following statutory provision: "Any protection order issued or consent agreement approved pursuant to this section may be renewed in the same manner as the original order or agreement was issued or approved." R.C. 3113.31(E)(3)(c). In doing so, he suggests a modification extending the duration of a CPO from two years to the maximum term of five years constitutes a "renewed" CPO. He

then says a renewal of a CPO requires new evidence of domestic violence. *See D.G. v. M.G.G.*, 2018-Ohio-5394, ¶ 27-32 (7th Dist.) (motion to renew requires new evidence satisfying the statute while allowing the court to view past evidence for context and support). He argues there was not a preponderance of the sufficient credible evidence to justify granting a new CPO, citing a case reviewing the manifest weight of the evidence supporting the issuance of the CPO. *H.A. v. J.A.*, 2026-Ohio-847, ¶ 6-9 (7th Dist.) (whereas the scope of the CPO is subject to an abuse of discretion review).

**{¶54}** Initially, we note the statute recognizes a distinction between a renewed CPO and a modified CPO. *Compare* R.C. 3113.31(E)(3)(c) ("renewed in the same manner as the original") *to* (E)(3)(a) and (E)(8). Subdivision (E)(3)(a) provides: "Any protection order issued or consent agreement approved under this section shall be valid until a date certain, but not later than five years from the date of its issuance or approval . . . *unless modified* or terminated as provided in division (E)(8) of this section." (Emphasis added.) R.C. 3113.31(E)(3)(a).

**{¶55}** The cited division (E)(8) begins, "The court may modify or terminate as provided in division (E)(8) of this section a protection order or consent agreement that was issued after a full hearing under this section." R.C. 3113.31(E)(8)(a); *see also* R.C. 3113.31(E)(1) (for reference to the initial full hearing: "After an ex parte or full hearing, the court may grant any protection order, with or without bond, or approve any consent agreement to bring about a cessation of domestic violence against the family or household members or persons with whom the respondent is or was in a dating relationship").

**{¶56}** Either party may move for modification, but "[t]he moving party has the burden of proof to show, by a preponderance of the evidence, that modification . . . of the protection order or consent agreement is appropriate . . . because the terms of the original protection order or consent agreement are no longer appropriate." R.C. 3113.31(E)(8)(b). In considering whether to modify (or terminate) a CPO (including a consent agreement) issued or approved under this section, the court shall consider all relevant factors, including, but not limited to the: (i) the petitioner's consent; (ii) the petitioner's fear of the respondent; (iii) the current nature of the parties' relationship; (iv) the parties' circumstances such as proximity and shared children; (v) the respondent's compliance

with the original order; (vi) the respondent's continuing involvement with illegal drugs or alcohol; (vii) any conviction for an offense of violence since the order's issuance; (viii) any other orders of protection; (ix) the respondent's participation in domestic violence treatment; (x) the time since the issuance of the CPO; (xi) the respondent's age and health; (xii) the last threat of harm or other relevant information on safety. R.C. 3113.31(E)(8)(c). The weighing of such factors is within a trial court's broad discretion.

**{¶57}** In a case cited by Appellant, it was observed that a modification of a CPO by extending its term (to no more than the maximum of five years total) is distinct from the renewal of a CPO, which occurs after the expiration of the original CPO (or seeks a new term that is longer than permitted for an extension of the original order). *Martin v. Martin*, 2013-Ohio-5703, ¶ 8-11, 22 (10th Dist.). *Compare D.G.*, 2018-Ohio-5394, at ¶ 4-7, 27 (7th Dist.) (assuming without analysis that a pre-expiration motion to modify by extending the original CPO was a motion to renew but where the precise issue did not appear to be raised).

**{¶58}** Here, the modification occurred prior to expiration, and the duration was not extended beyond the maximum. It was specifically pointed out by the court that the duration was being modified to make the original CPO a maximum term CPO. Appellant has not shown the modification of duration of the CPO was unreasonable under the factors applicable to modification, especially his continued noncompliance and his recognition that his conduct was the result of alcohol consumption.

**{¶59}** Assuming arguendo an extension is akin to a renewal, we proceed to address Appellant's argument on new evidence supporting a renewal, which the trial court also addressed. In arguing Appellee did not present competent, credible *new* evidence of his conduct creating a danger of domestic violence to support the renewal, Appellant says there was no evidence demonstrating a continued fear of imminent serious physical harm.

**{¶60}** However, the DVCPO statute defines domestic violence as including in pertinent part:

> The occurrence of one or more of the following acts against a family or household member . . . Placing another person by the threat of force in fear of imminent serious physical harm *or committing a violation of section*

> *2903.211* [menacing by stalking] or 2911.211 [aggravated trespass] of the
> Revised Code . . .

(Emphasis added.) R.C. 3113.31(A)(1)(a)(ii), (b) (or "occurrence of one or more of [such] acts . . . against a person with whom the respondent is or was in a dating relationship"); *see also* R.C 3113.31(A)(3) (defining family or household member).

**{¶61}** Appellant's argument places emphasis on the first portion of subdivision (a)(ii) without acknowledging the emphasized alternative in the second portion of the same subdivision ("or committing a violation of section 2903.11"), which is relevant in this case. *See, e.g., A.M. v. Leone*, 2025-Ohio-728, ¶ 56-58, 74-75 (7th Dist.). As Appellee points out, the cited R.C. 2903.211 defines menacing by stalking. R.C. 2903.211(B). The menacing by stalking statute provides:

> No person by engaging in a pattern of conduct shall knowingly cause
> another person to believe that the offender will cause physical harm to the
> other person or a family or household member of the other person or cause
> mental distress to the other person or a family or household member of the
> other person.

R.C. 2903.211(A)(1).

**{¶62}** We note the first option in this menacing by stalking statute speaks to a fear of physical harm without requiring the feared harm to rise to the level of serious physical harm. *Id*. Furthermore, this statute contains a second option involving mental distress. *Id*. Mental distress not only includes a mental condition "that involves some temporary substantial incapacity" but also includes one "that would normally require mental health services" regardless of whether the victim sought such services. R.C. 2903.211(D).

**{¶63}** Most notably, as recently explained by the Ohio Supreme Court, actual mental distress is not required under the plain language of this statute. *Z.J. v. R.M.*, 2025-Ohio-5662, ¶ 18, 31 ("believe" modifies both "physical harm" and "mental distress"). To obtain a protection order, "a petitioner need not show that he has suffered actual mental distress—but only a belief that the respondent will cause him mental distress" when relying on R.C. 2903.211. *Id.* at ¶ 46. The *Z.J.* case involved a civil stalking protection order (CSPO), which is governed by a statute similarly incorporating the menacing by stalking statute. *Id.* at ¶ 11, citing R.C. 2903.214 (C)(1) ("engaged in a violation of section

Case No. 26 BE 0008

2903.211 of the Revised Code against the person to be protected by the protection order"). Thus, the holdings in various cases requiring actual mental distress but predating *Z.J.* are no longer valid, and various other prior cases did not discuss the mental distress option because there was no allegation of actual mental distress (under the former interpretations of the menacing by stalking statute).[3]

**{¶64}** As Appellant acknowledges, the petitioner's burden in seeking (or renewing) a domestic violence CPO under R.C. 3113.31 is preponderance of the evidence. *See Felton v. Felton*, 79 Ohio St.3d 34, 42-43 (1997) (rejecting the clear and convincing evidence burden for issuance of a domestic violence CPO, and finding "sufficient, credible evidence to support" the required elements); R.C. 3113.31(E)(3)(c) (renewed in same manner as original order). A preponderance of the evidence is defined as the greater weight of the evidence or evidence that leads the trier of fact to find the existence of a contested fact is more probable than its nonexistence. *State v. Stumpf*, 32 Ohio St.3d 95, 102 (1987). "The greater weight may be infinitesimal, and it is only necessary that it be sufficient to destroy the equilibrium." *Id.*, quoting *Travelers' Ins. Co. v. Gath*, 118 Ohio St. 257, 261 (1928).

**{¶65}** As the preponderance of the evidence standard is less than clear and convincing evidence, there is no requirement for the evidence to produce a "firm belief" in the mind of the trier of fact. *Compare Cross*, 161 Ohio St. at 477. And, of course, the relevant preponderance of the evidence standard is much less than the beyond a reasonable doubt standard, which would be the required standard of proof for a criminal charge of menacing by stalking. *See id.*

**{¶66}** As intent dwells in the mind of the defendant, establishing mens rea revolves around an evaluation of the totality of the surrounding facts and circumstances, and the defendant's mental state can be proven by inference. *Treesh*, 90 Ohio St.3d at 484-485 (direct evidence of a defendant's purposeful intent to kill is rarely available, but

---

[3] For instance, a case cited by Appellant contained no allegation of mental distress (because the person to be protected was a minor who did not want the protection order issued against her mother) and no allegation of a pattern of conduct related to the minor (for regular physical harm under the menacing by stalking statute). In reversing the protection order, the appellate court noted the magistrate recognized the minor was not in fear of imminent serious physical harm while improperly deciding the competent teenager should have been in fear. *Seibert v. Seibert*, 2003-Ohio-3758, ¶ 6-7 (3d Dist.). Additionally, the main holding appeared to be that the petitioner-uncle lacked standing to file the petition to have the minor protected. *Id.* at ¶ 5, 8.

circumstantial evidence inherently possesses the same probative value as direct evidence). A rational fact-finder could find Appellant was aware his posts would "probably" cause mental distress to Appellee *or* cause her to believe he will cause her mental distress. *See* R.C. 2901.22(B) ("A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature."). Appellee's receipt of the posts was foreseeable, as was her reaction. *State v. Crawl*, 2025-Ohio-2799, ¶ 12, 17 (where the Supreme Court said specific intent was not required and this mental state did not require the offender's prediction of the "precise consequences" of conduct, "only that the consequences were foreseeable"). In fact, the trial court also found Appellant acted purposely, citing R.C. 2901.22(A), an even higher mental state.

{¶67} We incorporate our discussion of various exhibits from the hearing on Appellee's motion to extend the CPO, which proceeded at the same time as the motion to impose the previously-suspended sentence for contempt. In addition to disparaging her and making accusations about her sex life in posts containing their child's photographs, Appellant slandered her professionally. This occurred despite the existence of a CPO and two prior contempt judgments. There was sufficient evidence to support the trial court's decision to extend the CPO. And, upon reviewing the record before us, the decision was not contrary to the manifest of the evidence. In weighing the evidence and rational inferences and considering the credibility of each party, we cannot find the court clearly lost its way and created a manifest miscarriage of justice in extending the CPO's duration. Nor has Appellant demonstrated an abuse of discretion in adopting the magistrate's decision extending the duration of the CPO. This assignment of error is overruled.

ASSIGNMENT OF ERROR THREE

{¶68} Appellant's final assignment of error contends:

"THE TRIAL COURT ERRED BY ADOPTING THE MAGISTRATE'S DECISION BY INCLUDING THE SONS AS PROTECTED PERSONS UNDER THE CPO."

{¶69} Appellee's children were listed as additional protected persons in the August 22, 2023 CPO and in the October 30, 2023 slightly modified CPO. Both were entered with Appellant's consent at the CPO full hearing. Appellant does not challenge

the denial of his motion to terminate or to modify the CPO, wherein he requested to eliminate the children from it (presumably because the original duration passed by the time he filed his brief and the children remain protected by the CPO due to the extension granted on request of Appellee).

**{¶70}** Based on Appellant's characterization of the extension of the duration as a renewal rather than a modification of the CPO's duration, he argues the renewal required new evidence of a CPO violation related to the children as well. He contends there was not competent credible evidence that he "contacted, threatened, harmed, or placed either child in fear of imminent serious physical harm, nor . . . that [he] violated any CPO provision directed to the children." (Apt. Br. 15).

**{¶71}** As explained under the prior assignment of error, even assuming the modification of the CPO's duration qualified as a renewal, fear of imminent serious physical harm was not required; nor was fear of ordinary physical harm. *See* R.C. 3113.31(A)(1)(a) (DVCPO statute incorporating the menacing by stalking statute), citing R.C. 2903.211 ("engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person"). Again, the plain language of the latter menacing by stalking statute makes clear "a petitioner need not show that he has suffered actual mental distress—but only a belief that the respondent will cause [the petitioner or a family or household member of the petitioner] mental distress . . ." *Z.J.*, 2025-Ohio-5662, at ¶ 18, 31, 46.

**{¶72}** Contrary to Appellant's contention, posts were directed to the children, even if not sent directly to them. The youngest child's photograph was repeatedly posted with captions denigrating the child's mother. The mother testified Appellant's conduct was "spilling over onto our children." (7/1/24 Tr. 53). The mother discussed Appellant's continual posting of false accusations about her cheating on him with his boss; as to the falsity of his posts, she attested she never cheated on Appellant and did not start dating until after they broke up. *Id*. at 41. He also made this accusation in a phone call with one of the children despite a court order telling him not to disparage Appellee or discuss the case in those calls. *Id*. at 30, 46.

Case No. 26 BE 0008

**{¶73}** Appellee also attested to a precarious statement Appellant attributed to her concerning her employment was false and could affect her family financially. *Id*. at 40. She noted she was forced to discuss some posts with the children after they became aware of them. *Id*. She discussed the children's mental health, pointing out Appellant's drunk posting has affected them at home and at school. *Id*. at 43. Both parents testified that due to Appellant's Facebook posts, one of Appellant's friends, who was a teacher but not the child's teacher, called the older child out of class to make inquiries about the parties' relationship. *Id*. at 27-29, 41-43. In addition, this child's friends forwarded Appellant's posts to the child. *Id*. at 38-39.

**{¶74}** We recognize it is a stressful situation to have one's child included in a CPO sought by the child's other parent. However, Appellant consented to the original two-year CPO and consented to including his child and Appellee's other child as protected persons. He then continually violated it and pushed its terms to the limits. The court specifically pointed out throughout the proceedings, including in the final entry, that the parenting time issues were under the jurisdiction of the juvenile court proceedings. This is not the appeal of any juvenile court order that may have been incorporated into the CPO, and we do not have the juvenile record or orders before us.

**{¶75}** Assuming arguendo the extension of the CPO was a renewal requiring new evidence of menacing by stalking rather than merely evidence on the statutory modification factors, there was legally sufficient evidence supporting the extension of CPO (which already included the children) from two years to five years. Although inclusion of Appellant's own child in the CPO for an additional three years seems strict, some rational fact-finder could conclude by a preponderance of the evidence that he knew his conduct would not only cause Appellee to believe he would cause the children mental distress but also knew his conduct would cause the children to believe he would cause them mental distress. *See* R.C. 2903.211(A)(1) ("knowingly cause another person to believe that the offender will . . . cause mental distress to the other person or a family or household member of the other person").

**{¶76}** Reviewing weight and credibility, this is not an extraordinary case where Appellant suffered a manifest miscarriage of justice due to the trier of fact losing its way. The decision was not contrary to the manifest weight of the evidence. Also and

Case No. 26 BE 0008

alternatively, the court did not abuse its discretion in adopting the magistrate's decision (modifying the CPO by extending the duration prior to its expiration). This assignment of error is affirmed.

**{¶77}** Finally and additionally, although Appellant states he is only appealing the decision on Appellee's May 2024 motions, in a way, he is challenging the denial of his motion to terminate or remove the children from the CPO by challenging the extension of the CPO covering both Appellee and the children.[4] The May 8, 2025 magistrate's decision noted Appellee's May 2024 motions to impose the contempt sentence and to extend the CPO were heard on July 1, 2024. However, after the hearing, those motions were held for decision, first due to Appellant's appeal (from a magistrate order) and then *because Appellant obtained counsel*. This seemingly provided the opportunity to present additional arguments regarding the extension request at the hearing.

**{¶78}** Appellant soon filed his motion to terminate the CPO or remove the children from the CPO (and Appellee thereafter filed another contempt motion based on additional December 2024 posts). The hearing on the motions proceeded on February 3, 2025 and continued on March 5, 2025, after which the magistrate released the decision on all outstanding motions.

**{¶79}** As Appellee argued in responding to Appellant's objections, Appellee's brief says additional support for the decision on her motions was presented at hearings taking place after the July 1, 2024 hearing. She emphasizes Appellant's failure to meet his burden by addressing the contents of the February or March hearings or ensuring these transcripts were made part of the record. *See* Civ.R. 65.1(F)(3)(iii) (burden on objecting party), (iv) (objections shall be supported by the transcript of all evidence submitted to the magistrate); *accord* App.R. 9(B)(1),(4),(5); *see also Florenz v. Omalley*, 2020-Ohio-4487, ¶ 15 (2d Dist.) (failure of objector-turned-appellant to provide a transcript of the full hearing before the magistrate, as required by Civ.R. 65.1(F), leaves appellate court without a full record of the evidence presented); *T.H. v. Villoni*, 2020-Ohio-3767, ¶ 12 (9th Dist.) (respondent-appellant's duty under Civ.R. 65.1(F) to provide the transcript).

---

[4] He does not purport to directly challenge the decision on his motion (possibly theorizing arguments on terminating the original CPO or removing the children from it became moot after the expiration of its original term in August 2025, after the magistrate's extension).

{¶80} In reply, Appellant insists he was not required to address those transcripts on appeal and we cannot consider them because he is not purporting to appeal his motion to terminate or remove the children (and Appellee is not appealing the denial of her December 2024 contempt motion). However, termination is the opposite side of the coin as extension, and the extension request was left open to provide Appellant further opportunity to contest it at later hearings on his motion to terminate (or remove). Even under his framing of the extension as a renewal requiring new evidence as if an original CPO, the contents of the February and March hearings would be relevant to a review of the issue of extension versus termination of the CPO (or removal of the children from it). This is especially true for the arguments related to the children in the third assignment of error. In any case, as reviewed above, Appellant's arguments are rejected on review of the hearing transcript he claims is the only relevant one.

{¶81} For the following reasons, the judgment is affirmed.


Waite, P.J., concurs.

Dickey, J. concurs.

———————————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**